SIXTH DIVISION

December 28, 2001

No. 1-00-3731

AMERICAN NATIONAL BANK & TRUST ) Appeal from the

COMPANY OF CHICAGO, Guardian ) Circuit Court of

of the Estate of Gustavo ) Cook County.

Estriveros, a minor and disabled ) 

person, and GLORIA ESTRIVEROS, )

Individually, )

) No. 96 L 13830

Plaintiffs-Appellants, )

)

)

)

COUNTY OF COOK, ) Honorable

) Sophia Hall,

Defendant-Appellee. ) Judge Presiding.

JUSTICE O'BRIEN delivered the opinion of the court:

Plaintiffs, American National Bank & Trust Company, as guardian of the estate of Gustavo Estriveros, and Gloria Estriveros, individually, appeal the order of the circuit court granting summary judgment for defendant, the County of Cook, on plaintiffs' medical malpractice action.  On appeal, plaintiffs argue that the circuit court erred in holding that sections 6-105 and 6-106(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act), 745 ILCS 10/6-105, 10/6-106(a) (West 2000) immunize defendant from liability.  We reverse and remand.

Gloria Estriveros (plaintiff) received her prenatal care at defendant's medical clinic.  On October 3, 1986, plaintiff went to defendant's medical clinic for an ultrasound, which showed that plaintiff's baby was in a "transverse lie," meaning that the baby was lying perpendicular to his mother's body.  

A baby in a transverse lie position cannot be delivered vaginally, because there is no part of the baby's body to form a wedge to lead the way through the cervix.  Further, a woman who goes into labor in such a condition runs the risk of a cord prolapse, meaning that the umbilical cord slips through the cervix and can no longer pulsate, thereby depriving the baby of oxygen and nourishment.  

Several treatment options are available for a woman with a baby in the transverse lie position, depending on how far the baby is from term.  First, the doctor can monitor the mother over a period of time to see if the baby changes position inside her womb.  Second, the doctor can perform an external version, a procedure in which the doctor physically moves the baby by pressing on the mother's abdominal wall.  Third, the doctor can perform a cesarean section at fetal maturity.

Here, doctors monitored plaintiff's condition as her pregnancy proceeded.  On December 4, plaintiff was seen by Doctor David Baum at defendant's clinic.  Doctor Baum charted that plaintiff's baby was in the cephalic position, meaning that the baby was positioned with its head down in the womb.  On December 11, plaintiff was seen by defendant's second-year resident, Doctor Vernita Tucker, who charted that plaintiff's baby was in the transverse lie position. On December 18, plaintiff was seen in Cook County Hospital by Doctor Pang, who charted that the baby was in the vertex position, meaning that its head was down and thus, was not in the transverse lie position.  However, plaintiff also underwent an ultrasound on December 18 which showed that the baby was in the transverse lie position.  On December 23, plaintiff was examined at defendant's clinic by Doctor Elias Sabbagha, who charted that the baby was in a transverse lie.

On January 6, plaintiff again was seen by Doctor Vernita Tucker, defendant's second-year resident.  Doctor Tucker performed a Leopold's maneuver on plaintiff, 
i.e.
, she manipulated plaintiff's abdomen in order to feel for the baby's position. Doctor Tucker determined that the baby was cephalic, meaning that he was positioned head-first or head down, and, thus, was no longer in a transverse lie.  Doctor Tucker also charted that plaintiff was "status post external version," meaning that an external version had been performed on plaintiff two weeks earlier.  However, Doctor Tucker admitted in her deposition that there was nothing in plaintiff's medical records to indicate that an external version had been performed two weeks prior to January 6. When asked why she had charted that plaintiff was "post external version," Doctor Tucker indicated some uncertainty, as she could not remember the specifics of the January 6 examination; Doctor Tucker stated that she "assume[d]" plaintiff must have told her about the external version.  

Plaintiff went into labor on January 27, 1987.  Doctor Sabbagha, who was charting the delivery, stated that the baby was in a footling breech position; however, plaintiffs' expert, Doctor Allan Charles, testified that based on his review of all the records, the baby was in the transverse lie position.  

Doctors performed an emergency C-section on plaintiff because a cord prolapse had occurred.  The baby was born with severe brain damage resulting from the prolapsed cord.  

Plaintiffs brought a medical malpractice action against defendant, alleging that defendant acted negligently by: (1)improperly disregarding the diagnosis that the baby was in a transverse lie; (2)failing to properly manage the diagnosed condition of a transverse lie; (3) improperly assuming that the external version had been performed to treat the transverse lie; (4) failing to properly determine whether an external version had been performed; (5) failing to consult attending staff about the existing diagnosis of a transverse lie; (6) failing to have attending staff review plaintiff's care and treatment; (7) failing to admit plaintiff to the hospital on January 6; (8) improperly instructing plaintiff to go home on January 6; and (9) failing to see that an external version or C-section was performed prior to the cord prolapse.

Plaintiffs' expert, Doctor Charles, opined that defendant's agent, Doctor Tucker, acted negligently on January 6 by: (1) incorrectly assessing the position of the baby and failing to recognize that the baby was in a transverse lie or breech position; (2) failing to perform a non-stress test or ultrasound to confirm the position of the baby; (3) incorrectly assuming that an external version had been performed; and (4) failing to consult with her attending physician.  

Defendant filed a motion for summary judgment, arguing that, even assuming Doctor Charles' opinions were correct, defendant was immune from liability based on sections 6-105 and 6-106 of the Tort Immunity Act.  Section 6-105 states:

"Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others."  745 ILCS 10/6-105 (West 2000).

Section 6-106(a) states:

"Neither a local public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental or physical illness or addiction or from failing to prescribe for mental or physical illness or addiction." 745 ILCS 10/6-106(a) (West 2000).

Section 6-106(d) states:

"Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission in administering any treatment prescribed for mental or physical illness or addiction or exonerates a local public entity whose employee, while acting in the scope of his employment, so causes such an injury." 745 ILCS 10/6-106(d)(West 2000).

The circuit court granted defendant's motion for summary judgment.  Plaintiffs filed this timely appeal.

Summary judgment is appropriate when, viewed in the light most favorable to the nonmoving party, the pleadings, depositions, and admissions on file reveal that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  
Ragan v. Columbia Mutual Insurance Co
., 183 Ill. 2d 342, 349 (1998).  The standard of review in cases involving summary judgment is 
de
 
novo
.  
Ragan
, 183 Ill. 2d at 349.

Defendant argues that summary judgment was appropriately entered in its favor because plaintiffs' allegations of negligence are premised on Doctor Tucker's failure to correctly diagnose the baby's position on January 6.  Defendant argues that the circuit court correctly determined that it was immune under section 6-106(a) of the Tort Immunity Act for such a failure to diagnose.

We disagree.  In 
Michigan Avenue National Bank v. County of Cook
, 191 Ill. 2d 493 (2000), our supreme court considered section 6-106(a), which immunizes local public entities and their employees for the failure to diagnose, and section 6-106(d), which holds public employees responsible for negligently prescribing or administering treatment which causes injury.  The court noted the well-settled rule that where the statutory language is clear and unambiguous, the court must give it effect as written, without reading into it limitations or conditions that the legislature did not express.  
Michigan Avenue National Bank
, 191 Ill. 2d at 508.  The court found no ambiguity in the words "diagnosis" and "treatment" as used in section 6-106, and therefore accorded those words their plain and ordinary meaning.  
Michigan Avenue National Bank
, 191 Ill. 2d at 510-11.  The court noted that Webster's dictionary defines "diagnosis" as an "'investigation or analysis of the cause or nature of a condition, situation, or problem,'" and that Black's Law Dictionary defines "diagnosis" as "'[t]he determination of a medical condition (such as disease) by physical examination or by study of its symptoms.'" 
Michigan Avenue National Bank
, 191 Ill. 2d at 510, quoting Webster's Third New International Dictionary 622 (1993) and Black's Law Dictionary 464 (7th ed. 1999).  The court noted Sloan-Dorland's definition of "treatment" as "[t]he management and care of a patient for the purpose of combating disease or disorder." 
Michigan Avenue National Bank
, 191 Ill. 2d at 512, quoting Sloan-Dorland Annotated Medical-Legal Dictionary 746 (1987).  

Doctor Tucker's actions on January 6 did not constitute "diagnosis," as she did not examine plaintiff in order to investigate, analyze, or determine plaintiff's medical condition. Rather, Doctor Tucker was already aware of plaintiff's medical condition, as she testified that she had read the note from plaintiff's most recent visit to defendant's obstetrical clinic on December 23, in which Doctor Sabbagha wrote that plaintiff's baby was in the transverse lie position.  Defendants' own expert, Doctor Michael Socol, testified that the transverse lie diagnosis was the "existing diagnosis" at the time plaintiff was seen by Doctor Tucker on January 6.  Thus, Doctor Tucker's actions on January 6 consisted of treating by caring for and managing 
plaintiff's previously diagnosed known condition.  Under section 6-106(d), public employees are liable for injuries caused by negligently prescribing or administering treatment; accordingly, the circuit court erred in granting summary judgment for defendant pursuant to section 6-106.

Defendant argues that since the baby was mobile inside plaintiff's womb, each prenatal examination (including Doctor Tucker's examination on January 6) involved a separate and independent diagnosis to determine whether the baby was still in the transverse lie position.  We disagree.  When plaintiff walked into Doctor Tucker's examination room on January 6, Doctor Tucker was already aware that plaintiff was pregnant and that her baby had been diagnosed as being in a transverse lie position.  During that January 6 examination, Doctor Tucker monitored and treated plaintiff's known condition by examining plaintiff's records and performing the Leopold maneuver to determine the baby's current position.  The issue is whether said treatment was negligently performed.  As discussed, defendant is liable for any negligent treatment administered by its agent, Doctor Tucker.

Defendant argues that 
Michigan Avenue National Bank v. County of Cook
, 191 Ill. 2d 493 (2000) and 
Mabry v. County of Cook
, 315 Ill. App. 3d 42 (2000), compel a result different than the one reached here.  We disagree.  In 
Michigan Avenue National Bank
, Collins visited Cook County Hospital on several occasions from September 1986 to February 1987 concerning lumps and pain in her breast, among other gynecological ailments.  
Michigan Avenue National Bank
, 191 Ill. 2d at 496-498.  In October 1986, Collins was diagnosed with fibrocystic breast disease and advised to follow up for appointments to monitor the condition.  
Michigan Avenue National Bank
, 191 Ill. 2d at 497.  In July 1988, a lump in Collins' breast was diagnosed as cancerous; eventually the cancer spread, and Collins died in November 1989. 
Michigan Avenue National Bank
, 191 Ill. 2d at 499.  Plaintiffs filed a medical malpractice action against defendants (the County and its physicians), alleging that defendants were negligent for failing to order a mammogram, failing to adequately perform examinations and tests on Collins, failing to perform a biopsy, failing to diagnose Collin's breast cancer, and failing to administer proper and appropriate medical and nursing care to Collins.  
Michigan Avenue National Bank
, 191 Ill. 2d at 499.  The supreme court affirmed the grant of summary judgment to defendants.  The court held:

"Because the gravamen of plaintiff's action against defendants is that defendants' failure either to perform examinations or to adequately perform examinations led to defendant's failure to diagnose Collins' breast cancer, which, in turn, proximately caused her death, the immunity provided to local public entities and their public employees in section 6-105 and subsection (a) of section 6-106 applies."  
Michigan Avenue National Bank
, 191 Ill. 2d at 512.

In 
Mabry
, Ms. Pinkston went to the emergency room of Cook County Hospital on April 30, 1992, complaining of dizziness and shortness of breath.  
Mabry
, 315 Ill. App. 3d at 45.  She was diagnosed and treated for asthma and respiratory distress.  
Mabry
, 315 Ill. App. 3d at 45-47.  Ms. Pinkston died from a pulmonary embolism on May 3, 1992.  
Mabry
, 315 Ill. App. 3d at 47.  Plaintiff filed a medical malpractice action against defendants, the County of Cook and Cook County Hospital.  The appellate court reversed a jury verdict in favor of plaintiff, holding:

"[L]ike 
Michigan Avenue National Bank
, we believe that plaintiff's entire cause of action is premised on defendants' failure to diagnose the pulmonary embolism and the failure to conduct physical examination tests that would have enabled the County physicians to discover that Pinkston had a pulmonary embolism. Accordingly, the defendants are immune from liability under sections 6-105 and 6-106(a)."  
Mabry
, 315 Ill. App. 3d at 53.  

In contrast to 
Michigan Avenue National Bank
 and 
Mabry
, here there was testimony (from Doctor Charles) that plaintiff had been 
correctly
 diagnosed as having a baby in the transverse lie position; thus, unlike 
Michigan Avenue National Bank
 and 
Mabry
, the present case involves negligent treatment of a known medical condition, as opposed to a failure to diagnose.  As discussed, defendant is not immune for any negligent treatment.

Although there was some contrary evidence regarding whether or not plaintiff had been correctly diagnosed (
i.e.
, Doctor Sabbagha's statement, contrary to Doctor Charles, that the baby was in a footling breech position at delivery and not in a transverse lie position), such conflicting evidence raises a question of material fact inappropriate for resolution by summary judgment.  

During oral argument on this case, defendant argued that plaintiff's allegations of negligence primarily involve defendant's alleged failure to conduct examinations, specifically, an ultrasound or non-stress test, and the failure to 
prescribe
 treatment, specifically, an external version or C-section. Defendant argued that its alleged failure to conduct an ultrasound or non-stress test is immunized under section 6-105, which grants immunity to a local public entity and its employees who fail to make or who make inadequate physical examinations for purposes of determining whether a person suffers from a disease or physical or mental condition.  Defendant argued that its failure to prescribe an external version or C-section is immunized under section 6-106(a), which grants immunity to local public entities and public employees for the "fail[ure] to prescribe for mental or physical illness or addiction."  745 ILCS 10/6-106(a)(West 2000).    Plaintiff responded that defendant's negligence consisted of acts of commission and omission which occurred after diagnosis and  
during her treatment
, and as such, fall within the ambit of section 6-106(d).  Section 6-106(d) states that, "Nothing in this section exonerates a public employee from liability for injury proximately caused by 
his negligent or wrongful act or omission in administering any treatment prescribed
 for mental or physical illness ***."  (Emphasis added.)  745 ILCS 10/6-106(d) (West 2000).

 The appellate court opinion in 
Michigan Avenue Bank
, 306 Ill. App. 3d 392 (1999), is instructive.  In 
Michigan Avenue Bank
, we stated,

"Argument could be made *** that once diagnosis of a medical condition is made and treatment of that condition is prescribed and undertaken, any subsequent diagnosis required to be made as a result of that treatment, such as with respect to complications arising from medications prescribed or medical procedures performed, may not be entitled to the immunity protection of section 6-106(a).  For instance, a medication could be therapeutic for a diagnosed illness but toxic to an undiagnosed illness.  Treatment of the former would require the medical professional to inquire as to common conditions of pathology that would be aggravated by the intake of medication prescribed for the diagnosed illness.  Treatment of the diagnosed illness also might require the medical professional to perform further testing when adverse reactions occur as a result of the treatment prescribed for the diagnosed medical condition and to diagnose and treat any additional medical conditions that result.  The making of the subsequent diagnosis would become part of the treatment prescribed for the medical condition initially diagnosed;  and there would be no immunity if the subsequent diagnosis was incorrectly made (a negligent or wrongful act) or if the diagnosis was not made at all (an act of omission)."  
Michigan Avenue Bank
, 306 Ill. App. 3d at 402-03.

Following the same logic here, once diagnosis of a medical condition is made and treatment of the condition is prescribed and undertaken, any subsequent prescription or examination required to be made pursuant to that condition is part of the patient's treatment.  Under section 6-106(d), in the course of administering the treatment prescribed there is no immunity if the subsequent prescription or examination was incorrectly made (a negligent or wrongful act) or if the prescription or examination was not made at all (an act of omission).  See 745 ILCS 10/6-106(d) (West 1992)  ("[n]othing in this section exonerates * * * for injury proximately caused by * * * negligent or wrongful act or omission in administering any treatment prescribed").  Here, as discussed, plaintiff was diagnosed with a transverse lie prior to her examination by Doctor Tucker on January 6.  The prescribed treatment consisted of regularly monitoring plaintiff's condition and performing non-stress tests, ultrasounds, and the Leopold's maneuver to determine whether the baby's position had changed and to determine whether an external version or C-section ultimately should be performed.  Doctor Tucker's alleged failure to schedule or perform an ultrasound, non-stress test, external version, or C-section constituted an act of omission in administering plaintiff's prescribed treatment for the previously diagnosed transverse lie and, as such, is afforded no immunity under section 6-106(d).

PARAGRAPH DISCUSSING THE APPELLATE COURT OPINION IN 
MICHGAN AVENUE NATIONAL BANK
 DELETED.

Before concluding, we address plaintiffs' argument that sections 6-105 and 6-106(a) violate due process, equal protection, and constitute special legislation by distinguishing between patients injured by medically negligent diagnosis and patients injured by medically negligent treatment.   Neither party argues that sections 6-105 and 6-106(a) affect a fundamental right or discriminates against a suspect class.  Therefore, the rational basis test is the appropriate standard for determining plaintiffs' due process, equal protection, and special legislation challenges to sections 6-105 and 6-106(a).  
County of Bureau v. Thompson
, 139 Ill. 2d 323, 335 (1990); 
Bernier v. Burris
, 113 Ill. 2d 219, 228 (1986). 

Under the rational basis test, judicial review of a legislative classification is limited and generally deferential.  The challenged classification need only be rationally related to a legitimate state goal and if any state of facts can reasonably be conceived to justify the classification, it must be upheld.  
Committee for Education Rights v. Edgar
, 174 Ill. 2d 1, 37 (1996).

Here, the legislature reasonably could have determined that some medical conditions are extremely difficult to diagnose and examine, and, as such, that local public entities and their employees should be protected from liability for medically negligent diagnosis and examination.  The legislature also reasonably could have determined that once an accurate medical diagnosis and/or examination is made, and the patient's condition is known and treatment prescribed, the justification for immunity no longer exists and therefore the local public entities and their employees who treat said patient owe him a duty of reasonable care and are liable for any negligent treatment.  Accordingly, sections 6-105 and 6-106(a) are constitutional, as a rational basis exists for distinguishing between patients injured by medically negligent diagnosis and patients injured by medically negligent treatment.

 For the foregoing reasons, we reverse the order of the circuit court granting summary judgment for defendant and remand for further proceedings.

Reversed and remanded.

BUCKLEY, J., concurs.  O'MARA FROSSARD, specially concurs.

JUSTICE O'MARA FROSSARD, specially concurring:

I write separately to make the point that where, as in this case, an accurate medical diagnosis is alleged to have been made, followed by a prescribed course of treatment, there is no exoneration from liability under subsection (d) of section 6-106(d) of the Tort Immunity Act for injury proximately caused by a negligent or wrongful act or omission in administering any treatment prescribed.

The fact that an accurate medical diagnosis together with a prescribed course of treatment as the result of that diagnosis was alleged in this case distinguishes it from 
Mabry
, where failure to diagnose was the gravamen of the alleged medical malpractice and immunity was thereby afforded under subsection (a) of section 6-106(a) of the Tort Immunity Act.